## MONROE BETTERTON v. STATE.

No. A-3666—Opinion Filed May 10, 1920.

(189 Pac. 760.)

(Syllabus.)

1. **INDICTMENT AND INFORMATION—Motion to Set Aside Information—Bias of Committing Magistrate—Time to Object.** A motion to set aside an information for murder will not lie on ground that the committing magistrate had previously held an

Inquest on the body of the deceased, and was therefore biased and prejudiced against the defendant, where no objection was made and no affidavit for change of venue was filed.

2.    **HOMICIDE—Murder—Conviction—Sufficiency of Evidence.** In a prosecution for wife murder, the conviction and punishment of death awarded will not be disturbed where the evidence shows a deliberate premeditated killing without provocation.

*Appeal from District Court, Craig County;*
*A. C. Brewster, Judge.*

Monroe Betterton was convicted of murder, and the death penalty assessed, and he appeals. Affirmed, with directions as to execution of sentence.

Monroe Betterton, charged with the murder of his wife, Elzadah Betterton, in Craig county, on the 9th day of July, 1919, was tried and convicted of murder, and the death penalty assessed.

H. E. Ridenhour was the first witness for the state. He testified:

"I was chief of police of Vinita on the 9th day of July, 1919, and was called to Arthur Thomas' home on North Brown street. I found the woman lying on the front porch dead, and the defendant was sitting on the north end of the porch. I asked the defendant why he killed that woman, and he said he did not kill her. I think he told me she killed herself. I found a 32 automatic pistol in the top dresser drawer in the north room. I have that pistol. Here it is. Arthur Thomas' house is in the shape of a T, with two rooms facing east to the street and one room behind. I found two or three 32 automatic pistol cartridge shells in the south room."

Dr. A. W. Herron testified:

"I am county physician; I made an examination of the body of Elzadah Betterton and found three gunshot wounds. One bullet entered a little above and to the left

of the navel and passed out on the left buttock. Another entered the right arm about midway between the shoulder and elbow, and entered the body. It came out just below the angle of the scapula in the back. The other one went through the right lung and into the heart, carrying away the right auricle of the heart, and lodged between the fifth and sixth rib on the left side, and was taken out by Dr. Near."

Dr. C. S. Near testified that he assisted in the examination, and described the wounds in substance as stated by Dr. Herron.

Mrs. Mamie Betterton testified:

"I am 16 years old. Elzadah Betterton was my mother. Monroe Betterton was my stepfather. Clifford Betterton, son of the defendant, is my husband. We were married July 1, 1919. The defendant and my mother came to Arthur Thomas' place the night before the killing. After they went to bed I heard them quarreling. The defendant hit my mother with his fist and knocked her against the table, and she ran from him into the room where we were. The next morning I went over to one of our neighbors to sew, and Mother went with me. About noon she said she was going back to Monett that day. She bundled her clothes up and laid them on the bed in the south room and laid her hat out there, and was standing at the dresser combing her hair. I and my two little brothers were in the room, and the defendant shot her. Her back was towards him, and she turned around and hollered, 'Oh, don't do that any more!' and he shot her again; then she started to run out of the house, and he just put the gun up against her and shot her again. He shot her three times, and when he shot her the last time she hollered, 'Oh, my God!' I ran and grabbed Mamma in my arms, and she fell down across my feet dead. He shot her with an automatic pistol. My brother Raymond is 8 years old and Ralph is 4 years old. Some one came and asked the de-

fendant who killed her, and he said his boy did. My mother's name was Lockwood before she married the defendant."

Arthur Thomas testified:

That the defendant and the deceased came to his house about 10 o'clock the evening before the killing, and after they went to bed he heard them quarreling, and she hollered and said he hit her on the side of her head with his fist. "I opened the door and went in there and told him to cut that out. He was making for her again, and I told him to go to bed and behave himself." He sat up in a chair. "I am a son-in-law of the defendant. I have a 32 Colt's automatic pistol. I put this pistol in a suit case and put some clothes in there on top of it and laid another suit case on top of it, and threw a quilt over them. Up to that time I had kept the pistol in a dresser drawer. When I went to work that morning he walked about a block with me and then returned. He said he was going to send that woman back to Monett, and he was going to go to work somewhere. About 12:30 I was told at the refinery that I was wanted at home. They were taking the body away when I reached there. I found a bullet in the window sash of the south room, and it came out of a 32 shell. This is the bullet."

Frank Page testified:

"I live in Vinita, about 75 yards from the Thomas house. I heard the shooting. There were three shots. I ran over and found a woman lying on the porch. The defendant came out of the house and threw up his hands and said, 'What in the name of the Lord made her shoot herself?' something like that. I said, 'She never shot herself.' He said, 'Well my boy did.' The woman was just breathing, and died in a few minutes. It was then about half past 12."

Clifford Betterton testified:

"My age is 22 years. Monroe Betterton, the defendant, is my father. I, with my wife, was visiting my sister, Mrs. Arthur Thomas. I was on the front porch when the shooting occurred. I heard two pistol shots, and saw the deceased just before she fell. She was going out of the south door on the east porch when she fell. I ran in and found my father with an automatic pistol in his left hand. I jerked the gun out of his hand and asked him, 'What did you mean?' I went out the back door after my wife, and the defendant came out after me. I was holding the gun in my hand, and he said, 'Where did you get that; did you take it away from her?' When I took the pistol from the defendant he was standing just through the middle door between the north and south room. My wife and sister, Mrs. Thomas, were present when I took the pistol from him."

J. L. Stevens testified:

"I live at Vinita. I went to the Arthur Thomas place about noon, and saw the lady lying on the porch dead. The defendant was right inside of the door when I walked up to the porch. I asked him who killed the woman, and he did not answer. He didn't seem to be excited."

Raymond Lockwood testified:

"I am eight years old. I go to school and was in the second grade. I know what it means to be sworn; if I don't tell the truth, I would go down to the old devil. When I hold up my hand to be sworn, it means to swear to the truth. I came to Arthur Thomas' house with Monroe Betterton and my mother. I saw him shoot my mother. Me and my little brother were sitting on the suit case lacing up our shoes. Monroe Betterton is the man sitting right over there. My mother was standing at the looking-glass combing her head. He shot her three times with an automatic pistol that looked like the one lying there. Mamma had her things on the bed ready to go to Monett and was combing her head, and he shot her."

On the part of the defendant Arthur Thomas testified that he was the husband of May Thomas; that she was at that time in bed sick and unable to be present.

Flora Jane Blachert testified that she was a reporter and stenographer, and took in shorthand the testimony of the various witnesses on the preliminary hearing of Monroe Betterton held before D. C. Roper, justice of the peace, on the 28th day of July, 1919, and transcribed the same, and that the pages from 48 to 59, inclusive, were a correct transcript of the testimony of Mrs. May Thomas, as given on the preliminary hearing.

Thereupon the state withdrew its objection, and the transcript of testimony of Mrs. May Thomas was read to the jury as follows:

"I live on North Brown. The defendant is my father. Elzadah Betterton died at my house on the 9th day of this month. I was in the kitchen when the shooting took place. There are three rooms, a south room, north room, and west room. The shooting took place in the south room. . I heard only two shots. I saw the defendant after the shooting. He had nothing in his hand when I saw him. We had a 32 automatic pistol in the house. My father came around in the back yard and said, 'Oh, my! I can't live without her,' and that is all he ever said. Tuesday night they had their little racket, and he came in and asked me if we had a gun, and I said, 'No; Papa sold his gun;' and he said, 'Have you a razor?' and I said 'No.' That was all that was said that night. The next morning he went a piece with my husband. When he returned he said, 'Arthur said he had not sold that gun, and I want to get the gun and take it to Monett and sell it;' and I said, 'I don't care what Arthur said; the gun is not here that I know of.' I did not know but what he would kill himself, and I could not stand the idea of him killing himself in my home. He said

that morning to me: 'Sweetheart, you and Mamie take a walk, and when you come back it will all be settled.' I never thought but what he was going to kill himself. I didn't go for the walk. My husband had hid the gun in the suit case, and he said he thought he had hid it so that my father could not find it. I went to the suit case to get it, and it was gone."

Monroe Betterton, as a witness in his own behalf, testified:

"I am 48 years old. I was married to Elzadah Betterton the 11th day of June, 1918. We lived together four or five months. I left her and went up to Purdy to my aunt's. At that time we were living at Monett, Mo. I came back and we lived together about a month and a half, and I went back to my aunt's. I was married to this woman twice. The last time on the 1st day of July, 1919. We had been divorced just one week. We came to Vinita to visit my daughter on the 3d day of July, and stayed until the 6th. Then we went back to Monett. On the 8th day of July we came back to Vinita and went to my daughter's and stayed there that night. We did not have a quarrel. She went to Mamie's bed and talked to her a little bit, and when she came back she commenced crying, and she kept that up until 11 or 12 o'clock. After we went to bed she just screamed out that she could not stand that trouble any longer and got up. I got up with her and just took her in my arms and said, 'Sweetheart, for goodness sake don't be worrying; you are killing yourself and me, too.' I really don't know what she was worrying about. In 15 or 20 minutes she quieted down and laid down on the bed and went to sleep. I sat by the side of the bed all night. I did not strike her and pull her hair, or anything of that kind. After breakfast I went part of the way with my son-in-law and my son down towards the refinery, and asked them to speak for me for a job down there. My wife said she was going back to Monett. When I left Monett I had $10, and I gave the money to her that I had left. I didn't shoot my

wife. I was not in the room when she was shot. I was in the north room, standing in the door. There was three shots fired just as fast as a man could count almost. I ran in there. I did not know what had happened. Mamie Betterton was standing right by the door. She had that gun and ran and shoved it into my side and snapped it twice. I took the gun away from her. I started into the north room, and met my son, and he said, 'Give me that gun.' I handed it to him, and went on into the room where my daughter was and asked her where was the nearest doctor, and we went out on the porch, where my wife was lying dead. No man ever loved a woman any dearer than I loved that woman. Before that Mamie Betterton came into the room where we were talking, and my wife said, 'Mamie, if you won't go back to Monett with me, get ready and go with me to the depot,' and Mamie said, 'I would not go with you anywhere, you darned old bitch.' I got up and went out of the room. I stood in the north door about a minute, and the shooting took place. Those two little boys were in the room, Raymond Lockwood and Ralph Lockwood. I don't know who shot my wife. She said several different times that she was going to commit suicide and get out of her trouble."

On cross-examination he stated:

"I was married the last time in Mt. Vernon, Mo., on the 1st day of July, and the killing occurred on the 9th day of July. When Mr. Ridenhour come he asked me where the gun was, and I said, 'I haven't got any gun.' He did not ask me why I shot that woman, and I did not say to Mr. Ridenhour that she killed herself, or that the boy did it. He asked me how did it happen, and I told him I didn't know."

His further cross-examination is as follows:

"Q. Mr. Betterton, you was convicted of the crime of having murdered one wife prior to this time was you not? A. No, sir; I was not.

"Q. Is it true or not that you were convicted and sentenced to 99 years in the pen on a charge of murder in Missouri? A. Yes, sir.

"Q. Is it true or is it not that you were convicted in the state of Missouri of the crime of having murdered a woman and sentenced to a term of 99 years in the Missouri penitentiary? A. Well, I was not convicted of a crime at all. I pleaded guilty to that crime. It was an accident, was the way it was. It wasn't no crime at all.

"Q. You say you pleaded guilty to having murdered a woman? A. I pleaded guilty to the charge; yes, sir.

"Q. And took 99 years in the penitentiary? A. Yes, sir; I was guilty of that woman's death, but it was an accident.

"Q. You were paroled, wasn't you? A. Yes, sir; I was paroled.

"Q. Why didn't you inform the officers who killed your wife? A. I sure wanted to protect that girl. I did not know whether she did it or who done it. I know that she had the gun, and she snapped the gun twice at me.

"Q. I want to ask you further if it is not true that parole expired last April? A. It did, for the truth.

"Q. You violated that parole? A. No; I have not. That Governor issued me a full pardon the 1st day of April.

"Q. You were pardoned the 1st day of April? A. Yes, sir; I was."

In rebuttal H. E. Ridenhour testified:

"The only way that this automatic pistol can be snapped twice is for the shell to explode in it. That cocks the gun again. If there is another load in it you can't snap it but once (indicating) ; now the gun is snapped once if that was loaded, and if it exploded it would throw the shell out, but otherwise you can't snap the gun off any more un-

less you take it this way and cock it, and then you can snap it once more."

*Clyde McGary*, for plaintiff in error.

*S. P. Freeling*, Atty. Gen., and *W. C. Hall*, Asst. Atty. Gen., for the State.

DOYLE, P. J. (after stating the facts as above). The plaintiff in error, Monroe Betterton, herein referred to as the defendant, was convicted, awarded the death penalty, and was sentenced to be electrocuted for the murder of his wife, Elzadah Betterton. The homicide was committed on the 9th day of July, 1919. The information was filed in the district court of Craig county on the 3d day of November, and on the same day, it appearing that the defendant was unable to employ counsel, the court appointed C. McGary as counsel to defend him; Mr. McGary having represented the defendant in the preliminary examination. He was duly arraigned on the 4th day of November, and on the following day entered his plea of not guilty. The case was tried at the November term, 1919. He was found guilty of murder, and his punishment assessed as stated. Motion for new trial was duly filed. The motion was overruled on the 17th day of November, and on the same day judgment of death was by said court pronounced upon him. January 23, 1920, was the day appointed for his execution. He appeals from said judgment to this court, but there has been no appearance in his behalf on his appeal. However, the importance of the case in its results has demanded and we have given careful examination and consideration to the record and all questions involved therein to ascertain whether reversible error was committed on the trial.

The first alleged error is in overruling the defendant's motion to set aside the information.

It appears from the record that when the case was called for trial leave was granted to the defendant to withdraw his plea of not guilty and interpose a motion to set aside the information on the ground that the committing magistrate was disqualified from holding the preliminary examination, for the reason that he had theretofore presided and held the inquest on the body of Elzadah Betterton, the deceased; that therefore he was biased and prejudiced against the defendant and was unable to give him a fair and impartial examination; that the defendant did not know that said magistrate had held said inquest, and therefore did not make application for a change of venue.

It is sufficient to say that the motion to set aside the information was without merit and was properly overruled.

The next assignment is that the court erred in admitting irrelevant, incompetent, and immaterial testimony, and in refusing to admit competent and material testimony offered by the defendant.

Upon a careful examination of the transcript of the testimony we have been unable to find a single ruling of the court on the admission of evidence or in the rejection of evidence upon which error could be predicated, and it appears that during the course of the trial no exception was taken to any such ruling of the court.

Another assignment of error is that the court erred in giving to the jury instructions numbered 4 and 5.

The instructions of the court have been examined carefully, and we find that the jury was fully instructed as to the presumption of innocence and their duty to acquit if

they entertained a reasonable doubt of the defendant's guilt, and we have failed to find any error in the instructions which the court gave to the jury prejudicial to the substantial rights of the defendant. It further appears that no objections or exceptions were taken to the instructions as given by the court, and that no instructions were requested to be given by the defendant.

The remaining assignments of error are, in substance, that the verdict of the jury was contrary to the law and to the evidence.

Upon a careful review and considering all the evidence in the case, the conclusion which we reach is that the guilt of the defendant is established beyond a doubt, and we feel constrained to say that there is not a single palliating feature in the case which even tends to reduce the crime of the defendant below murder. It appears that the case was one of premeditated deliberate murder, as the jury very properly found, and we find nothing in the record tending to show that death is an undue punishment. Upon consideration of the entire record the court is satisfied that the substantial rights of the defendant have not been prejudiced by reason of any error of law occurring in the trial, and we cannot avoid the conclusion that the defendant had a fair and impartial trial, with every right accorded to him that the law justifies or requires. For the reasons stated, the judgment appealed from should be, and it accordingly is, affirmed.

The day appointed for the execution of the death sentence having passed owing to the pendency of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Craig county be carried into execution on Friday, the 9th day of

July, A. D. 1920. The warden of the penitentiary at McAlester is ordered and directed to cause the sentence to be executed according to law.

ARMSTRONG and MATSON, JJ., concur.